ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x
                                      :
UNITED STATES OF AMERICA
                                      :       SEALED INDICTMENT
        - v. -
                                      :       S7 13 Cr. 521
JOSEPH MANUEL HUNTER,
   a/k/a "Frank Robinson,"            :
   a/k/a "Jim Riker,"
   a/k/a "Rambo,"                     :
TIMOTHY VAMVAKIAS,
   a/k/a "Tay,"                       :
DENNIS GOGEL,
   a/k/a "Dennis Goegel,"             :
   a/k/a "Nico,"
MICHAEL FILTER,                       :
   a/k/a "Paul," and
SLAWOMIR SOBORSKI,                    :
   a/k/a "Gerald,"
                                      :
        Defendants.
                                      :
- - - - - - - - - - - - - - - - - - - x

*USDC SDNY*
*DOCUMENT*
*ELECTRONICALLY FILED*
*DOC #:*
*DATE FILED: 9/30/13*

## OVERVIEW

1.   JOSEPH HUNTER, a/k/a "Frank Robinson," a/k/a "Jim
Riker," a/k/a "Rambo," the defendant, served in the United
States Army from 1983 to 2004.  In the years since 2004, HUNTER
has acted as a "contract killer"; for pay, he has succeeded in
arranging for the murder of a number of people.

2.   During 2012 and 2013, JOSEPH HUNTER, a/k/a "Frank
Robinson," a/k/a "Jim Riker," a/k/a "Rambo," the defendant,
recruited a team of four former soldiers.  Three of these four
former soldiers - DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a
"Nico," SLAWOMIR SOBORSKI, a/k/a "Gerald," and MICHAEL FILTER,

a/k/a "Paul," the defendants - had served in the armed forces of certain European countries, and were trained as snipers.  One of these four former soldiers, TIMOTHY VAMVAKIAS, a/k/a "Tay," the defendant, had served in the United States Army, until 2004.

3.    Along with JOSEPH HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," the defendant, the former soldiers - TIMOTHY VAMVAKIAS, a/k/a "Tay," DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," SLAWOMIR SOBORSKI, a/k/a "Gerald," and MICHAEL FILTER, a/k/a "Paul," the defendants - each joined a conspiracy to import large volumes of cocaine into the United States.  As part of this conspiracy, the defendants put their military skills to use - by conducting "counter-surveillance"; by providing security; and by watching over a plane as, the defendants were told, it was being loaded with hundreds of kilograms of cocaine bound for New York.

4.    In addition, three of the former soldiers - JOSEPH HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," and DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," the defendants - engaged in a murder-for-hire conspiracy.  The object of the murder-for-hire conspiracy was to assist a drug-trafficking organization - by assassinating both a Special Agent with the Drug Enforcement Administration ("DEA") and a person who was providing

information about the drug-trafficking organization to the DEA. In furtherance of this murder-for-hire conspiracy, the former soldiers worked to obtain sophisticated weapons (including a machine gun); acquired masks (so that they could kill the DEA agent and the source of information without being detected); and formulated an escape and weapons-disposal plan – which included entering the country where the murders would take place without having their passports stamped. In exchange for the murders, HUNTER, VAMVAKIAS and GOGEL were together to be paid approximately $700,000, and HUNTER was to receive an additional payment of $100,000 for his leadership role.

## THE DEFENDANTS: FIVE FORMER SOLDIERS

5.   JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," the defendant, served from 1983 to 2004 in the United States Army, where he attained the rank of sergeant first class. While in the Army, HUNTER led air-assault and airborne-infantry squads; served as a sniper instructor; and trained soldiers in marksmanship and tactics as a senior drill sergeant. Since leaving the Army in 2004, HUNTER, now 48, has arranged for the murders of multiple people in exchange for money, among other completed acts of violence undertaken for pay. HUNTER is a citizen of the United States.

6.    TIMOTHY VAMVAKIAS, a/k/a "Tay," the defendant, served from 1991 to 1993 and from 1999 to 2004 in the United States Army, where he attained the rank of sergeant.  During his first term of enlistment, VAMVAKIAS spent a year deployed in South Korea and served as an infantryman.  During his second term of enlistment, VAMVAKIAS served as a military police officer and was stationed in Puerto Rico.  VAMVAKIAS is a citizen of the United States.

7.    DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," the defendant, served in the German armed forces from 2007 to 2010, where he attained the rank of corporal.  During his time in the German armed forces, GOGEL served as a sniper and received commendations for his sniper skills.  He also completed a military deployment to Kosovo.  GOGEL is a citizen of Germany.

8.    SLAWOMIR SOBORSKI, a/k/a "Gerald," the defendant, served in the Polish armed forces from 1998 to 2002 and from 2003 to 2011, during which time he trained as a sniper and was a member of an elite counter-terrorism unit.  Following his military service, SOBORSKI worked as a security contractor in Iraq, Afghanistan, Haiti, and other countries.  SOBORSKI is a citizen of Poland.

9.    MICHAEL FILTER, a/k/a "Paul," the defendant,
served in the German armed forces from 2006 to 2009, where he
was trained as a sniper.  In 2009, FILTER was deployed to
Afghanistan.  FILTER later worked for private firms performing
security services.  FILTER is a citizen of Germany.

### COUNT ONE

### CONSPIRACY TO IMPORT COCAINE INTO THE UNITED STATES

The Grand Jury charges:

10.    From at least in or about 2012, up to and
including the date of the filing of this Indictment, in the
Southern District of New York and elsewhere, JOSEPH MANUEL
HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a
"Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," DENNIS GOGEL, a/k/a
"Dennis Goegel," a/k/a "Nico," MICHAEL FILTER, a/k/a "Paul," and
SLAWOMIR SOBORSKI, a/k/a "Gerald," the defendants, who will
first enter the United States in the Southern District of New
York, and others known and unknown, intentionally and knowingly
did combine, conspire, confederate and agree together and with
each other to violate the narcotics laws of the United States.

11.    It was a part and an object of the conspiracy
that JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim
Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," DENNIS
GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," MICHAEL FILTER,

a/k/a "Paul," and SLAWOMIR SOBORSKI, a/k/a "Gerald," the defendants, and others known and unknown, would and did distribute, and possess with intent to distribute, a controlled substance, to wit, five kilograms and more of mixtures and substances containing a detectable amount of cocaine, intending and knowing that such substance would be imported into the United States from a place outside thereof, in violation of Sections 959, 960(a)(3), and 960(b)(1)(B) of Title 21, United States Code.

## OVERT ACTS

12.   In furtherance of said conspiracy and to effect the illegal object thereof, JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," MICHAEL FILTER, a/k/a "Paul," and SLAWOMIR SOBORSKI, a/k/a "Gerald," the defendants, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

### Asia: Late 2012 Through Early 2013

### HUNTER Recruits a Team of Former European Soldiers

a.   During 2012 and early 2013, HUNTER collected resumes via e-mail for prospective members of a security team. In January 2013, HUNTER met with two individuals who held

themselves out as Colombian drug traffickers, but who were in fact confidential sources for the DEA ("CS-1" and "CS-2," or collectively, the "CSes"). HUNTER spoke with the CSes about serving as the head of security for the CSes' purported Colombian drug trafficking organization, and HUNTER provided the CSes with resumes for the individuals he had selected as prospective members of the security team.

### Asia: March 2013

### HUNTER and His Team Discuss "Assassinations" and Conduct Surveillance for a Narcotics Trafficking Organization

b.   During 2013, HUNTER, GOGEL, FILTER, and SOBORSKI traveled to a country in Asia ("Asian Country-1").

c.   On or about March 8, 2013, HUNTER and the CSes met in Asian Country-1; the meeting was audio- and video-recorded, and during the meeting:

i.   The CSes told HUNTER, in substance and in part, that the team HUNTER had assembled to perform security work for the CSes' narcotics trafficking organization could expect to see "a lot of dope going back and forth, thousands of kilos."

ii.   HUNTER and the CSes discussed "bonus jobs" (contract killings), and HUNTER confirmed for the CSes, in substance and in part, that he (HUNTER) had already discussed "bonus jobs" with part of his team – and that those team members

7

had indicated they wanted to do as much "bonus job" work as possible.

        iii.  HUNTER told the CSes, in substance and in part, that he himself had previously done "bonus work."

        d.    Later in the day, on or about March 8, 2013, HUNTER, GOGEL, FILTER, and SOBORSKI met; the meeting was audio- and video-recorded, and during the meeting:

        i.    HUNTER told GOGEL, FILTER, and SOBORSKI that they would be working for a Colombian cartel and that the men could expect to "see tons of cocaine and millions of dollars."

        ii.   HUNTER told GOGEL, FILTER, and SOBORSKI that, if they wished, they would have the opportunity to participate in "bonus work," which HUNTER explained meant "assassinations."  HUNTER told GOGEL, FILTER, and SOBORSKI that "most of the bonus work is up close . . . because in the cities . . . you don't get long-range shots."

        iii. HUNTER explained that he (HUNTER) had in fact previously committed acts of violence for pay – including, among other things, arranging for the murders of two female real estate agents.  With respect to the murders of the real estate agents, HUNTER said: "They went back to the house, they shot her, they didn't even go in – they shot her at the

door and left her there. But it was raining that day, so there was no people around, and they did it perfect, no problems. Now . . . I had two guys, two other guys that wanted bonus work. They did the job, but they did it sloppy, and I fired them. Sent them back home. These guys, the same thing – another real estate agent."

      e.   On or about March 10, 2013, HUNTER, GOGEL, FILTER, SOBORSKI, and the CSes met; the meeting was audio- and video-recorded, and during the meeting, the men discussed, among other things, GOGEL, FILTER, and SOBORSKI performing surveillance of a boat on behalf of the CSes' narcotics trafficking organization.

      f.   Later in the day, on or about March 10, 2013, HUNTER, GOGEL, FILTER, and SOBORSKI met; the meeting was audio- and video-recorded, and during the meeting:

      i.   HUNTER explained, in substance and in part, that he (HUNTER) believed the boat would contain illegal items and that the job would entail "counter-surveillance" – determining, among other things, whether "the police know about the boat."

      ii.   HUNTER described methods of performing surveillance of the boat.

g.   On or about March 21, 2013, through on or about March 26, 2013, GOGEL, FILTER, and SOBORSKI conducted surveillance of the boat.

h.   On or about March 24, 2013, HUNTER sent a report of GOGEL, FILTER, and SOBORSKI's activities to an e-mail account ("E-mail Account-1") that was said by the CSes to be an e-mail account of a person whom the CSes described as their narcotics trafficking partner.  HUNTER reported in his e-mail: "[t]he guys are continuing to watch the boat" and there had been "[n]o detection of any surveil[l]ance as of yet."

i.   On or about March 28, 2013, HUNTER sent an e-mail to E-mail Account-1, providing photographs of the boat on which GOGEL, FILTER, and SOBORSKI had performed surveillance.

### Africa: April 2013

### HUNTER's Team Conducts Further Surveillance for the Narcotics Trafficking Organization

j.   From on or about March 19, 2013, through on or about April 5, 2013, HUNTER sent numerous e-mails to E-mail Account-1 regarding GOGEL, FILTER, and SOBORSKI's travel to a country in Africa ("African Country-1").

k.   In or about April 2013, GOGEL, FILTER, and SOBORSKI traveled to African Country-1.

l.   On or about April 10, 2013, GOGEL, FILTER, SOBORSKI, and the CSes met in African Country-1; during the

10

meeting, the CSes asked GOGEL, FILTER, and SOBORSKI to provide security for meetings focused on a narcotics deal, and to conduct counter-surveillance related to a weapons deal.

m.   On or about April 11, 2013, and again on or about April 12, 2013, GOGEL, FILTER, and SOBORSKI provided security for a meeting during which the participants discussed, among other things, the distribution of illegal narcotics to the United States; certain participants in the meeting were representatives of a bona fide Eastern European drug-trafficking organization, which had shipped over 200 kilograms of cocaine during 2012.

n.   On or about April 13, 2013, GOGEL, FILTER, and SOBORSKI took photographs and conducted counter-surveillance of individuals whom, the CSes said, were conducting weapons negotiations with the CSes' drug trafficking organization.

o.   Later that day, on or about April 13, 2013, GOGEL, FILTER, SOBORSKI, and the CSes met; GOGEL, FILTER, and SOBORSKI reported on observations they had made while conducting counter-surveillance.

p.   On or about April 16, 2013, HUNTER sent an e-mail to E-mail Account-1; the e-mail stated that GOGEL, FILTER, and SOBORSKI "held [a] debriefing and pointed out some

minor mistakes." In the e-mail, HUNTER further stated that he would send "a slide show of some surveillance they did."

        q.   On or about April 18, 2013, HUNTER forwarded to E-mail Account-1 surveillance reports and photographs of the meetings in African Country-1 as to which GOGEL, FILTER, and SOBORSKI had conducted surveillance.

### Asia: May and June 2013

### HUNTER Adds VAMVAKIAS to the Team and Agrees That the Team Will Commit Multiple Murders for Hire

        r.   On or about May 6, 2013, HUNTER sent an e-mail to E-mail Account-1. HUNTER wrote: "Everyone is ready to go, just waiting further instructions. They also, really want a bonus job after this next mission, if available."

        s.   On or about May 18, 2013, HUNTER, VAMVAKIAS, and the CSes met in Asian Country-1; the meeting was audio and video-recorded, and during the meeting:

        i.   CS-1 and CS-2 introduced to HUNTER and VAMVAKIAS an additional purported member of the Colombian narcotics trafficking organization, who was in fact a confidential source for the DEA ("CS-3").

        ii.   HUNTER explained that he (HUNTER) had served in the military with VAMVAKIAS and had told VAMVAKIAS "[a]bout bonus work." HUNTER stated that VAMVAKIAS "knows the game."

iii. With respect to "bonus work," VAMVAKIAS stated: "I can handle it."

iv.   GOGEL and SOBORSKI joined the meeting; one of the CSes stated that assistance would soon be needed in a Caribbean country ("Caribbean Country-1") because of a "big load" being transported through Caribbean Country-1.  CS-1 also stated, in substance, that there was a "bonus job" in the offing, because there was a "leak" within the CSes' narcotics trafficking organization.

t.   On or about May 30, 2013, in response to an e-mail asking whether HUNTER's team would be willing to murder a United States law enforcement agent and a boat captain providing information to United States law enforcement authorities, HUNTER wrote an e-mail that read, in part: "My guys will handle it. . . . Are you talking about both the Captain and agent or just the Captain?"

u.   On or about May 30, 2013, in response to an e-mail stating that HUNTER's team had the option of either (1) killing the United States law enforcement agent and also the person providing information to law enforcement, or (2) killing just the informant, HUNTER wrote an e-mail that read, in part: "They will handle both jobs. They just need good tools."

13

**The Caribbean: June 2013**

**VAMVAKIAS Leads the Surveillance of a Cocaine-Laden Airplane and Discusses Details of the Agreed-Upon Contract Killings**

v.   On or about June 24, 2013, HUNTER sent an e-mail to CS-3 that read, in part: "Talk to Tay [VAMVAKIAS], he is mission leader for this one."

w.   On or about June 25, 2013, HUNTER sent a text message to VAMVAKIAS, asking, "Hey, how are things going? You guys on the job yet?" and inquiring, in substance and in part, whether one of the CSes had arrived in Caribbean Country-1.

x.   Later in the day, on or about June 25, 2013, VAMVAKIAS, GOGEL, FILTER, SOBORSKI, and CS-3 met at a hotel in Caribbean Country-1; the meeting was audio- and video-recorded, and during the meeting CS-3 asked VAMVAKIAS, GOGEL, FILTER, and SOBORSKI to conduct surveillance on a United States-registered airplane that, according to CS-3, would be loaded with 300 kilograms of cocaine being shipped to New York.  CS-3 provided the airplane's registration or "tail" number, and explained "you have to know it's an American aircraft – it's a U.S. registration."

y.   The next day, on or about June 26, 2013, VAMVAKIAS, GOGEL, FILTER, and SOBORSKI performed surveillance and took photographs of the loading of the airplane.

z.   On or about June 26, 2013, approximately one hour after the airplane took off, HUNTER sent an e-mail to E-mail Account-1: "Mission Complete."

aa.   On the same day, on or about June 26, 2013, HUNTER sent an e-mail to VAMVAKIAS.  It said, in part: "find out about next team mission and have Niko [GOGEL] get briefing on bonus [work]."

bb.   Later on the same day, on or about June 26, 2013, VAMVAKIAS, GOGEL, and CS-3 met; the meeting was audio- and video-recorded, and during the meeting:

i.   VAMVAKIAS and GOGEL reported on the airplane surveillance performed by VAMVAKIAS, GOGEL, FILTER, and SOBORSKI, stating, among other things, that they had seen the loading of the "product" onto the airplane.

ii.   VAMVAKIAS and GOGEL provided CS-3 with a thumb drive containing photographs taken during surveillance of the loading of the airplane.

iii. CS-3 explained that "the job is to kill a U.S. DEA agent and a source with the DEA," and told VAMVAKIAS and GOGEL that the DEA agent and DEA informant would be located in a certain country in Africa ("African Country-2") in the near future.  In response, VAMVAKIAS and GOGEL offered their ideas and plans for how to commit the murders, including using machine

15

guns, cyanide, or a grenade, and the need for masks and appropriate weapons.  VAMVAKIAS advised that they had "two masks" that they would use for the killings.  GOGEL said that they would figure out their "cover."  GOGEL asked: "Could we set him up, maybe you tell him to go there [African Country-2] and we just clip him there?"  VAMVAKIAS also said: "I was thinking if we hit the agent first, it would probably be better than hitting the snitch first."

       iv.  FILTER and SOBORSKI joined the meeting. VAMVAKIAS asked CS-3 whether they had "silencers for rifles," and said "my only problem with the 5.56 [a kind of rifle] . . . was the noise."

       cc.  Later on the same day, on or about June 26, 2013, VAMVAKIAS sent a message to HUNTER advising HUNTER that he had "got debriefed" about the murders requested on behalf of the drug trafficking organization.  VAMVAKIAS indicated that while CS-3 had suggested that each of VAMVAKIAS, GOGEL, FILTER, and SOBORSKI would participate in the murders ("all 4 of us are to be on this bonus"), not all of the men were up to the task ("our other two will not be able to handle this bonus bro").  In addition, VAMVAKIAS wrote that he would "debrief [HUNTER] about everything when we return."

<u>Asia: July and August 2013</u>

### <u>HUNTER, VAMVAKIAS, and GOGEL Make Final Arrangements to Commit the Murders-for-Hire in African Country-2</u>

dd.  On or about July 6, 2013, HUNTER sent a message to an e-mail address associated with CS-3 and to E-mail Account-1, providing a "list of items needed for the job."  The list included: "Two Submachine Guns with silencers (Mac 10, MP5, P90, MP7,,,something small)," "Two .22 pistols with Silencers (these are a must)," "One 308 Rifle with Scope and Case for it," "Two Level 3A Concealment Vests."

ee.  On or about August 15, 2013, HUNTER, GOGEL, and VAMVAKIAS traveled to a hotel in Asian Country-1 to meet with CS-3.

ff.  On or about August 15, 2013, HUNTER, GOGEL, VAMVAKIAS, and CS-3 met; the meeting was audio-recorded, and during the meeting:

i.  At the direction of HUNTER, GOGEL searched CS-3 for recording devices.

ii.  GOGEL agreed to meet with CS-3 the following day to provide masks that would be worn during the killings, and could be smuggled into African Country-2 in advance of the murders.

iii. HUNTER, VAMVAKIAS, and GOGEL reviewed purported surveillance photographs, said to have been taken in

17

African Country-2, of the two targets of the murder-for-hire:
the DEA agent and a person supplying information to the DEA.

iv.   After being told that a car was
associated with the targets of the murder-for-hire, HUNTER
stated: "We will need the license number and the car."

v.   HUNTER, VAMVAKIAS, and GOGEL discussed
the weapons that would be provided to VAMVAKIAS and GOGEL in
African Country-2 for use in committing the murders.  VAMVAKIAS
stated: "I think the two biggest weapons we need, two a piece,
would be the MP7 with suppression and two twenty-two's with
suppression," referring, respectively, to a sub-machine gun and
two .22 caliber pistols.  VAMVAKIAS also stated that VAMVAKIAS
and GOGEL were "probably gonna have to get up close to them.
You know what I mean, to make sure it gets done."  GOGEL added,
with respect to a different weapon, a ".308": "The thing with
the .308 is it's fucking loud."  VAMVAKIAS also said: "you can't
suppress a .308, you know if we used the weapons with a
suppression system it's going to be easier for us to get in,
eliminate the target and get out without being heard."

vi.  VAMVAKIAS described the value of having
a smaller weapon in addition to an MP-7 sub-machine gun: "the
whole point in having the twenty-two is to finish the job or if
I have a weapons malfunction with my primary that's my

secondary.  You know, we gotta do this, hit it hard, hit it
fast, make sure it's done and get the fuck out of there.  That's
all that's to it.  If we got the right equipment, we're good to
go."

vii. After CS-3 advised HUNTER, GOGEL, and
VAMVAKIAS that CS-3 had good contacts for obtaining the weapons
needed, VAMVAKIAS stated: "if we can get the MP7s that would be
awesome.  That will guarantee that whatever gets in that kill
zone is going down."

viii.     GOGEL asked CS-3, "How we get the
equipment [weapons] there?  Do we meet with somebody there, or
somebody comes to the hotel?"; in response, CS-3 advised that he
(CS-3) would deliver "the bags."

ix.  HUNTER told CS-3 that only a two-person
team would be used to commit the killings, referencing GOGEL and
VAMVAKIAS.

x.  HUNTER asked CS-3 if "cars and motor
bikes" would be provided for the hit team; after CS-3 advised
that they would be provided, HUNTER further stated: "So you're
gonna have the vehicles, you're gonna have the tools [weapons],
and you're gonna take care of the masks for us."

xi.   HUNTER, GOGEL, and VAMVAKIAS discussed whether they could enter African Country-2 without the need to have their passports stamped.

xii. HUNTER and VAMVAKIAS discussed methods of escape from African Country-2 after GOGEL and VAMVAKIAS committed the murders.  Among other things, VAMVAKIAS suggested that the best method of escape would be for CS-3 to fly them out of African Country-2 on a small, private plane.

xiii.   HUNTER said that the team "budgeted two weeks for it . . . Two weeks once they're there;" VAMVAKIAS added: "Two weeks total.  We would have a week for surveillance and a week to make it happen."

xiv. HUNTER asked CS-3 about the return or disposal of the weapons that GOGEL and VAMVAKIAS would use in the killings: "For equipment recovery, do you want the stuff back or is it disposable? . . . What I think probably will happen is, though, they will put it in a pre-determined place and it will be there and you can have somebody pick it up . . . You see, going from the kill zone to wherever, of course they got to get rid of whatever it is."

xv.   With respect to the killers' escape from African Country-2 after the murders, VAMVAKIAS stated: "It makes me happy, I'm glad you're [CS-3] going to be part of the

extraction stuff . . . That's the biggest headache.  The job's
not the headache, it's getting in and out."

       gg.  The next day, on or about August 16, 2013,
GOGEL met with CS-3 at a hotel in Asian Country-1; the meeting
was audio- and video-recorded, and during the meeting, CS-3 told
GOGEL that an order had been placed for the weapons that GOGEL,
VAMVAKIAS, and HUNTER had requested.  GOGEL stated: "That's
perfect because even if they wear a Second Chance vest, the MP7
the projectile is so —" after which CS-3 interjected, "Yeah, go
right through."  GOGEL also noted that the murders could be made
to look like an ordinary street crime, stating, "[i]t could even
look like a bad robbery or anything, you know."

       hh.  Later in the same day, on or about August
16, 2013, in a hotel room in Asian Country-1, at a meeting that
was audio- and video-recorded:

       i.  GOGEL provided CS-3 with two highly
sophisticated latex facemasks to be transported to African
Country-2; the masks can make the wearer appear to be of another
race.

       ii.  GOGEL noted that he was available for
further criminal activity.  "Normally I was hired to do just
these jobs, you know, just to do this bonus stuff.  But,
seriously, anything coming up like that so just let me know I

will take care of them." GOGEL added: "That's fun, actually for me that's fun, I love this work."

### Africa: September 2013

### GOGEL and VAMVAKIAS Travel to African Country-2 To Murder the DEA Agent and Informant

ii.  On or about August 29, 2013, GOGEL sent a message to an e-mail account associated with CS-3 attaching a scan of GOGEL's passport and of VAMVAKIAS's passport, so that CS-3 could arrange for GOGEL and VAMVAKIAS's travel to African Country-2 to commit the murders.

jj.  On or about September 4, 2013, HUNTER sent an e-mail message asking if GOGEL and VAMVAKIAS ("the guys going on bonus job") could purchase airplane tickets to African Country-2.

kk.  On or about September 7, 2013, HUNTER sent an e-mail message requesting that visas for GOGEL's and VAMVAKIAS's entry into African Country-2 be e-mailed to him (HUNTER), so that he (HUNTER) could print the visas.

ll.  On or about September 9, 2013, HUNTER sent an e-mail message containing the flight number and arrival time of GOGEL's and VAMVAKIAS's September 25, 2013, flight to African Country-2.

mm.   On or about September 25, 2013, GOGEL and VAMVAKIAS arrived in African Country-2 to commit the planned murders for hire.

(Title 21, United States Code, Sections 963 and 959(c).)

## COUNT TWO

## CONSPIRACY TO MURDER A LAW ENFORCEMENT AGENT AND A PERSON ASSISTING LAW ENFORCEMENT AGENT

The Grand Jury further charges:

13.   The allegations set forth in Paragraphs One through Nine and Twelve above are incorporated by reference as if set forth fully herein.

14.   During at least 2013, up to and including the date of the filing of this Indictment, JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," and DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," the defendants, who will be arrested and first brought to the Southern District of New York, and others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed together and with each other to violate Section 1114 of Title 18, United States Code.

15.   It was a part and an object of the conspiracy that JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," and DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," the

defendants, and others known and unknown, would kill and attempt to kill an officer and employee of the United States and of any agency in any branch of the United States Government while such officer and employee was engaged in and on account of the performance of official duties, and any person assisting such an officer and employee in the performance of such duties and on account of that assistance, to wit, HUNTER, VAMVAKIAS, and GOGEL agreed to kill an agent of the U.S. Drug Enforcement Administration while engaged in and on account of his official duties, and to kill a confidential source assisting the agent with his official duties.

16.   In furtherance of the conspiracy and to effect the illegal object thereof, HUNTER, VAMVAKIAS, and GOGEL, the defendants, and others known and unknown, committed the overt acts set forth in Paragraph Twelve of this Indictment, which are fully incorporated by reference herein.

(Title 18, United States Code, Sections 1117 and 1114 and 3238.)

## COUNT THREE

## CONSPIRACY TO KILL A PERSON TO PREVENT COMMUNICATIONS TO LAW ENFORCEMENT AGENTS

The Grand Jury further charges:

17.   The allegations set forth in Paragraphs One through Nine and Twelve above are incorporated by reference as if set forth fully herein.

18.   During at least 2013, up to and including the date of the filing of this Indictment, JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," and DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," the defendants, who will be arrested and first brought to the Southern District of New York, and others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed together and with each other to violate Section 1512(a)(1)(C) of Title 18, United States Code.

19.   It was a part and an object of the conspiracy that JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," and DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," the defendants, and others known and unknown, would kill and attempt to kill another person, with the intent to prevent the communication by any person to a law enforcement officer and judge of the United States of information relating to the commission and possible commission of a Federal offense, to wit, HUNTER, VAMVAKIAS, and GOGEL agreed to kill a confidential source to the U.S. Drug Enforcement Administration with the intent to prevent communications by that confidential source to the U.S. Drug Enforcement Administration.

20.   In furtherance of the conspiracy and to effect the illegal object thereof, HUNTER, VAMVAKIAS, and GOGEL, the defendants, and others known and unknown, committed the overt acts set forth in Paragraph Twelve of this Indictment, which are fully incorporated by reference herein.

(Title 18, United States Code, Sections 1512(k), (h), and (a)(1)(C) and 3238.)

## COUNT FOUR

### CONSPIRACY TO POSSESS A FIREARM IN FURTHERANCE OF A CRIME OF VIOLENCE

The Grand Jury further charges:

21.   The allegations set forth in Paragraphs One through Nine and Twelve above are incorporated by reference as if set forth fully herein.

22.   During at least 2013, up to and including the date of the filing of this Indictment, JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," and DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," the defendants, who will be arrested and first brought to the Southern District of New York, and others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed together and with each other to possess, brandish, and discharge firearms, to wit, machine guns with silencers, during and in relation to, and in

furtherance of a crime of violence, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and (c)(1)(B)(ii).

23.   It was a part and object of the conspiracy that JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," and DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," the defendants, during and in relation to a crime of violence for which a person may be prosecuted in the United States, would use, carry, possess, brandish, and discharge an MP-7 machine gun and other assault weapons with silencers in furtherance of a crime of violence, to wit, the murder conspiracies alleged in Counts Two and Three of this Indictment.

24.   In furtherance of the conspiracy and to effect the illegal object thereof, JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," and DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," the defendants, committed the overt acts set forth in Paragraph Twelve of this Indictment, which are fully incorporated by reference herein.

(Title 18, United States Code, Sections 924(o) and 3238.)

## COUNT FIVE

## CONSPIRACY TO DISTRIBUTE COCAINE ON BOARD AN AIRPLANE

The Grand Jury further charges:

25.   The allegations set forth in Paragraphs One through Nine and Twelve above are incorporated by reference as if set forth fully herein.

26.   During at least 2013, up to and including the date of the filing of this Indictment, TIMOTHY VAMVAKIAS, a/k/a "Tay," DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," MICHAEL FILTER, a/k/a "Paul," and SLAWOMIR SOBORSKI, a/k/a "Gerald," the defendants, at least one of whom will first enter the United States in the Southern District of New York, and others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed together and with each other to violate the narcotics laws of the United States.

27.   It was a part and an object of the conspiracy that TIMOTHY VAMVAKIAS, a/k/a "Tay," DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," MICHAEL FILTER, a/k/a "Paul," and SLAWOMIR SOBORSKI, a/k/a "Gerald," the defendants, and others known and unknown, would and did distribute and possess with the intent to distribute a controlled substance, to wit, five kilograms and more of a mixture and substance containing a detectable amount of cocaine, on board an aircraft owned by a

United States citizen and registered in the United States, in violation of Sections 812, 959(b), and 960(b)(1)(B) of Title 21, United States Code.

28. In furtherance of the conspiracy and to effect the illegal object thereof, TIMOTHY VAMVAKIAS, a/k/a "Tay," DENNIS GOGEL, a/k/a "Dennis Goegel." a/k/a "Nico," MICHAEL FILTER, a/k/a "Paul," and SLAWOMIR SOBORSKI, a/k/a "Gerald," the defendants, committed the overt acts set forth in Paragraph Twelve of this Indictment, which are fully incorporated by reference herein.

(Title 21, United States Code, Sections 963 and 959(c).)

## FORFEITURE ALLEGATION AS TO COUNT ONE

29. As a result of committing the controlled substance offense alleged in Count One of this Indictment, JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," MICHAEL FILTER, a/k/a "Paul," and SLAWOMIR SOBORSKI, a/k/a "Gerald," the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting and derived from any proceeds that the said defendants obtained directly or indirectly as a result of the said violation and any and all property used or intended to be used in any manner or

part to commit or to facilitate the commission of the violation alleged in Count One of this Indictment.

### Substitute Assets Provision

30.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third person;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 21, United States Code, Sections 841(a)(1) and 853.)

## FORFEITURE ALLEGATION AS TO COUNT TWO

31.  As a result of committing the offense of conspiracy to murder a law enforcement agent and a person assisting a law enforcement agent in violation of Title 18, United States Code, Sections 1117, 1114, and 3238, alleged in Count Two of this Indictment, JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," and DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense.

### Substitute Assets Provision

32.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

       a.     cannot be located upon the exercise of due diligence;

       b.     has been transferred or sold to, or deposited with, a third person;

       c.     has been placed beyond the jurisdiction of the Court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be subdivided without difficulty;

It is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

> (Title 18, United States Code, Section 981 and
> Title 28, United States Code, Section 2461.)

## FORFEITURE ALLEGATION AS TO COUNT THREE

33.  As a result of committing the offense of conspiracy to kill a person to prevent communications to law enforcement agents in violation of Title 18, United States Code, Sections 1512(k), (h), and (a)(1)(C) and 3238, alleged in Count Three of this Indictment, JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," and DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense.

## Substitute Assets Provision

34. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third person;

      c.   has been placed beyond the jurisdiction of the Court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981 and Title 28, United States Code, Section 2461.)

## FORFEITURE ALLEGATION AS TO COUNT FOUR

35. As a result of committing the offense of conspiracy to possess a firearm in furtherance of a crime of violence in violation of Title 18, United States Code, Sections

924(o) and 3238, alleged in Count Four of this Indictment, JOSEPH MANUEL HUNTER, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," TIMOTHY VAMVAKIAS, a/k/a "Tay," and DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), all firearms and ammunition involved and used in the commission of the said offense, including but not limited to the following:

    a.   firearms, including machine and sub-machine guns;

    b.   silencers and suppressors;

    c.   ammunition and grenades;

    d.   masks;

    e.   knives or other weapons; and

    f.   computers, cell phones, and smart phones.

<u>Substitute Assets Provision</u>

36.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third person;

34

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 21, United States Code, Sections 924(d) and
Title 28, United States Code, Section 2461(c).)

## FORFEITURE ALLEGATION AS TO COUNT FIVE

37.  As a result of committing the controlled substance offense alleged in Count Five of this Indictment, TIMOTHY VAMVAKIAS, a/k/a "Tay," DENNIS GOGEL, a/k/a "Dennis Goegel," a/k/a "Nico," MICHAEL FILTER, a/k/a "Paul," and SLAWOMIR SOBORSKI, a/k/a "Gerald," the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting and derived from any proceeds that the said defendants obtained directly or indirectly as a result of the said violation and any and all property used or intended to be used in any manner or part to

commit or to facilitate the commission of the violation alleged in Count Five of this Indictment.

### Substitute Assets Provision

38. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

> a.  cannot be located upon the exercise of due diligence;
>
> b.  has been transferred or sold to, or deposited with a third person;
>
> c.  has been placed beyond the jurisdiction of the Court;
>
> d.  has been substantially diminished in value; or
>
> e.  has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 21, United States Code, Sections 841(a)(1) and 853.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

36

Form No. USA-33s-274 (Ed. 9-25-58)

---

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

JOSEPH HUNTER,
a/k/a "Frank Robinson,"
a/k/a "Jim Riker,"
a/k/a "Rambo,"
TIMOTHY VAMVAKIAS,
a/k/a "Tay,"
DENNIS GOGEL,
a/k/a "Dennis Goegel,"
a/k/a "Nico,"
MICHAEL FILTER,
a/k/a "Paul," and
SLAWOMIR SOBORSKI,
a/k/a "Gerald,"

Defendants.

---

### SEALED INDICTMENT

S7 13 Cr. 521

(21 U.S.C. §§ 959, 960(a)(3), 960(b)(1)(B),
and 963; 18 U.S.C. §§ 924(o), 1117, 1114,
1512(k), (h), and (a)(1)(C).)

---

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.

9/25/2013

Filed Sealed Seventh Superseding Indictment

us MJ Debra Freeman